UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

DONNA LEVY
DAVID LEVY
THOMAS PREZISO,

                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 16, 2012

1: (S5) 11 Cr. 62 (PAC)

**OPINION AND ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Donna Levy ("Mrs. Levy") and David Levy ("Mr. Levy," collectively "Defendants")

move pursuant to 18 U.S.C. § 2518(10) and Franks v. Delaware, 438 U.S. 154 (1978), to

suppress all evidence of their communications intercepted by the Government, and any evidence

derived therefrom, over wiretaps authorized pursuant to Title III of the Omnibus Crime Control

and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22 ("Title III"), and for a Franks hearing.

Defendants argue that the Government failed to meet its burden of proving the

"necessity" for the wiretaps under 18 U.S.C. § 2518(3)(c), that the judges who authorized the

wiretaps were misled by the Government's applications, and that all evidence derived as a result

of the wiretaps should be excluded as "fruit of the poisonous tree."

Defendants' arguments fail.  In light of the considerable deference the Court must grant

to the decisions of the District Courts that approved the wiretaps, Defendants have failed to show

that the Government's applications did not satisfy the statutory requirement of necessity.  Nor

have Defendants made the substantial preliminary showing that the Government's applications

contained misleading misstatements or omissions necessary to justify a Franks hearing.

For the reasons set forth below, Defendants' motion to suppress the evidence derived

from the wiretaps or, in the alternative, convene a Franks hearing, is DENIED.

## BACKGROUND

Defendants are charged with securities fraud, wire fraud, conspiracy to commit securities and wire fraud, and money laundering under a multiple-count superseding indictment.  (ECF No. 188.)  The superseding indictment alleges that Defendants defrauded founders and executives of, and investors in, several start-up companies by improperly obtaining shares of such companies, distributing misleading information about such companies to the public to artificially inflate the value of their shares, and then selling those shares into the market at manipulated valuations.

The Government's evidence includes approximately ten telephone conversations and fourteen voice messages involving Mrs. Levy (see Def. Donna Levy's Mem. of Law. in Supp. of Mot. to Suppress (June 13, 2012) ("Def. Mem."), ECF No. 198 at 7), and at least two telephone conversations involving Mr. Levy (see Statement of David Levy in Supp. of Mot. to Suppress (Oct. 17, 2012)), which were obtained from three wiretaps authorized pursuant to Title III.

The wiretaps at issue arose out of a multi-year investigation into illegal activity at the Port of New York and New Jersey by a special Task Force comprised of agents from the Drug Enforcement Agency, Internal Revenue Service, and Immigration and Customs Enforcement that, as of March 2010, was investigating narcotics trafficking at the Port, during which it had uncovered evidence of other crimes, including stock and wire fraud, union bribery, and extortion. (Def. Ex. 2, Mar. 23, 2010 Affir. at 2; id. ¶ 16.)  As part of the narcotics trafficking investigations, the Task Force cultivated a cooperating witnesses, a Port employee identified as CW-3, who assisted with the development of that investigation and ultimately helped identify an alleged "pump and dump" stock fraud scheme at the Port.  (Id. ¶¶ 16, 40–44.)

CW-3 brought to the Task Force's attention the activities of another Port employee, who then, in addition to those persons suspected of participation in the narcotics trafficking, became a

target of the Government's investigation and, ultimately, wiretapping (the "Target").  (Id. ¶¶ 40–44.)  According to CW-3, the Target had previously solicited money from CW-3 and other Port employees to invest with the promise that the employees would make money; however, the employees had lost almost all the money the Target had received from them.  (Id. ¶¶ 40–41.)

The information CW-3 provided about the Target's previous activities was corroborated and further developed by the Task Force's review of bank records and other information from a fraud investigator at TD Ameritrade, the brokerage firm where the Target operated investment accounts.  (Id. ¶¶ 42–44.)  A 2008 TD Ameritrade investigation indicated that the Target and another individual were using several accounts to heavily trade "penny" stocks with approximately 40 other accounts identified as belonging to individuals employed in the maritime shipping industry in the New York metropolitan area.  (Id. ¶ 42.)  These activities produced approximately $1.2 million in profits for the Target and the other individual involved.  (Id. ¶ 43.)  In late 2008, TD Ameritrade shut down these accounts for suspicious activities, ultimately concluding that the Target was participating in a pump and dump scheme.  (Id. ¶¶ 43–44.)  In February 2010, CW-3 learned that the Target was again soliciting funds from Port employees to invest.  (Id. ¶ 45.)  Thereafter, in February 2010, the Government arranged three consensually-recorded telephone calls between CW-3 and the Target, and a meeting between the two at which CW-3 wore a body wire and was subject to visual surveillance and provided the Target $5,000 to invest in a fund the Target described to CW-3 as similar to his previous activities.  (Id. ¶¶ 45–49.)  The Government proceeded to determine from calling records that the Target had been in frequent contact with others who previously invested with him as described by CW-3, as well as a stock broker in Florida who had a prior arrest record.  (Id. ¶¶ 57–60.)

On March 23, 2010, based on the narcotics trafficking and stock fraud investigations, the Government applied for Title III wiretaps on three phones, including one ("Target Phone 2") belonging to the Target.  (Id. ¶ 7.)  The Government's application was based on an Affirmation of Anthony Maddalone, a Bayonne Police Department Sergeant working as a Task Force Officer with the DEA (the "First Affirmation").  (Id. at 1.)  The First Affirmation recited the foregoing information regarding the stock fraud investigation and detailed the concurrent narcotics trafficking investigation.  Under a heading titled "III. Alternative Investigative Procedures Have Been Tried, Appear Unlikely to Succeed if Tried, Or Are Too Dangerous; There Is A Need for The Interception of Wire Communications over The Target Cellphones," the First Affirmation specifically stated that with respect to the stock fraud investigation (1) consensual interception of CW-3's phone was insufficient because CW-3 was not intimately involved in the stock fraud scheme to be privy to further information beyond what he already provided to the Government (¶ 67); (2) physical surveillance would not be useful because the stock fraud scheme was being operated primarily online and over the phone (¶ 70); (3) the use of undercover officers would not be helpful because introduction to the Target of an undercover officer posing as an investor would not further the investigation (¶ 76); (4) the use of additional confidential witnesses beyond CW-3 would face the same problem (¶ 80); and (5) although anticipated, the use of grand jury subpoenas would be limited to historical information that would not reveal ongoing fraudulent activities or participants (¶ 82).[1]  The First Affirmation stated generally that telephone calling records would not conclusively identify participants (¶ 73); search warrants were not appropriate (¶ 83); and arrests were not likely lead to cooperation or furthering the investigations (¶¶ 84–85).

---

[1]  The other phones on which the Government sought wiretaps (Target Phones 1 and 3) were identified as part of the alleged narcotics trafficking (see, e.g., id. ¶¶ 8, 15, 33–39, 50–52, 54–56, 61–63), and the reasons for the wiretaps relating to the narcotics investigation specifically were set forth separately from those relating to the stock fraud investigation  (see, e.g., id. ¶¶ 65, 66, 69, 74, 75, 77–79).

The Honorable Faith S. Hochberg, United States District Judge for the District of New Jersey, approved the application the same day, issuing an Amended Order on March 24, 2010. (Def. Ex. 3, Sealed Order (Mar. 23, 2010); Am. Sealed Order (Mar. 24, 2010).)

On April 26, 2010, the Government applied for an extension of the wiretaps based on a second Affirmation of Sergeant Maddalone, which identified additional persons who were recorded discussing the stock fraud scheme with the Target (the "Second Affirmation"). (Def. Ex. 5, Apr. 26, 2010 Affir. ¶¶ 3, 16, 35–41.) The Second Affirmation listed additional information the Government had acquired as a result of the wiretap on the Target's phone, including with whom the Target was communicating by phone to advance the pump and dump scheme, the actions they were taking, and at least one company whose stock was subject to the scheme. (Id. ¶¶ 35–41.) In describing why alternative methods of investigation would not reasonably be successful, the Second Affirmation related the same information as the First Affirmation, listing the deficiencies of certain methods for the investigations generally (see, e.g., id. ¶¶ 56, 63–66), and specifically identifying the shortcomings of others in the context of the stock fraud scheme where applicable (see, e.g., id. ¶¶ 50, 53, 59, 60). Judge Hochberg approved this application the same day. (Def. Ex. 6, Sealed Order (Apr. 26, 2010).)

On June 7, 2010, the Government applied for a second extension of the wiretap on the Target's phone as well as a wiretap on a new phone the Target had acquired, based on a third Affirmation of Sergeant Maddalone (the "Third Affirmation"). (See Kramer Aff. Ex. B, June 7, 2010 Affir. ¶¶ 7, 16, 34, 38–41, 44–46; Def. Mem. at 7.) The Third Affirmation also stated the need for a wiretap in the stock fraud investigation. (See, e.g., June 7, 2010 Affir. ¶¶ 50, 54, 61.) The Honorable Stanley R. Chesler, United States District Judge for the District of New Jersey, approved this application the same day. (Kramer Aff. Ex. B, Sealed Order (June 7, 2010).)

**DISCUSSION**

I.   **GOVERNING STANDARDS**

A.      **The Necessity Requirement under Title III**

18 U.S.C. § 2518 authorizes wiretaps where the Court "determines, on the basis of the facts submitted by the applicant, that there is probable cause to believe (1) that an individual was committing, had committed, or is about to commit a crime; (2) that communications concerning that crime will be obtained through the wiretap; and (3) that the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap." United States v. Yannotti, 541 F.3d 112, 124 (2d Cir. 2008) (quotation omitted).[2]

"In addition to finding probable cause, a court must also make a finding that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" United States v. Marroquin-Corzo, No. S1 10 Cr. 892 (DAB), 2012 WL 3245473, at *4 (S.D.N.Y. Aug. 7, 2012) (quoting 18 U.S.C. § 2518(3)(c)). Accordingly, Title III requires each application for a wiretap to include a "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This "necessity" requirement "is designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Serrano, 450 F. Supp. 2d 227, 236 (S.D.N.Y. 2006) (quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)).

This statutory requirement is not "an insurmountable hurdle and only requires that the Government demonstrate that normal investigative techniques would prove difficult." United

---

[2]  The standard for probable cause under Section 2518 is the same as the standard for a regular search warrant.  United States v. Diaz, 176 F.3d 52, 110 (2d Cir. 1999).

States v. Labate, No. S100 Cr. 632 (WHP), 2001 WL 533714, at *13 (S.D.N.Y. May 18, 2001)

(quotations omitted).  While "generalized and conclusory statements that the other investigative

procedures would prove unsuccessful" are not sufficient, "the Government is not required to

exhaust all conceivable investigative techniques before resorting to electronic surveillance."

United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009) (quotations omitted); Marroquin-

Corzo, 2012 WL 3245473, at *4.  Indeed, there is no requirement under Title III that  "that *any*

particular investigative procedures be exhausted before a wiretap may be authorized."  United

States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (emphasis added) (quotations omitted);

Marroquin-Corzo, 2012 WL 3245473, at *4.  "'Merely because a normal investigative technique

is theoretically possible, it does not follow that it is likely.  What [Title III] envisions is that the

showing be tested in a practical and commonsense fashion.'"  Concepcion, 579 F.3d at 218

(quoting S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190).  Title III

"'only requires that the agents inform the authorizing judicial officer of the nature and progress

of the investigation and of the difficulties inherent in the use of normal law enforcement

methods.'"  Concepcion, 579 F.3d at 218 (quoting United States v. Diaz, 176 F.3d 52, 111 (2d

Cir. 1999)); United States v. Rodriguez-Perez, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at *5

(S.D.N.Y. Aug. 16, 2012).

> **B.**     **Standard for Convening a Franks Hearing**

"False statements or omissions in an affidavit submitted in support of a wiretap

application may be grounds for suppression of communications intercepted pursuant to the

wiretap."  United States v. Cromitie, No. 09 Cr. 558 (CM), 2010 WL 3025670, at *1 (S.D.N.Y.

July 28, 2010).  Under Franks v. Delaware, a defendant challenging the Government's wiretap

application may obtain an evidentiary hearing to challenge the veracity of the affiant's

statements, but only in certain limited circumstances.  See 438 U.S. at 155–56; United States v. Zagari, 111 F.3d 307, 321–22 (2d Cir. 1997) (applying Franks analysis in context of Title III application).  A Franks hearing may be obtained only if a defendant makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the [underlying] affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause."  Franks, 438 U.S. at 155–56; see United States v. Falso, 544 F.3d 110, 125–26 (2d Cir. 2008).  A substantial preliminary showing of the intentional or reckless omission of material information may also serve as the basis for convening a Franks hearing.  See Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991); Labate, 2001 WL 533714, at *17.

    If a defendant makes such a showing, "the Court must then determine whether the misstatement or omission was necessary to the issuing court's finding."  United States v. Rajaratnam, No. 09 Cr. 1184 (RJH), 2010 WL 3219333, at *1 (S.D.N.Y. Aug. 12, 2010).  If a defendant cannot make a substantial preliminary showing that the Government made a misleading misstatement or material omission, then the defendant does not obtain a Franks hearing.  See Falso, 544 F.3d at 126; Zagari, 111 F.3d at 322; Rodriguez-Perez, 2012 WL 3578721, at *7.

    "The Franks standard is a high one."  Rivera, 928 F.2d at 604.  To be entitled to a Franks hearing, a defendant must "must make a substantial preliminary showing" of each of the prongs.  See United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998); Rajaratnam, 2010 WL 3219333, at *1 n.1.  As the Supreme Court explained, to satisfy this test, a defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false."  Franks, 438 U.S. at 171; United States v. Salas, No. 07 Cr. 557 (JGK), 2008 WL 4840872, at **9–10 (S.D.N.Y.

Nov. 5, 2008) (applying to Title III affidavit). "[E]very statement in a warrant affidavit does not have to be true." United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005) (quotations omitted); Cromitie, 2010 WL 3025670, at *1 (applying to Title III affidavit). As to omissions, the Second Circuit has explained in other warrant contexts that "'an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.'" United States v. Awadallah, 349 F.3d 42, 67–68 (2d Cir. 2003) (quoting United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990)); see also United States v. Rajaratnam, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *8 (S.D.N.Y. Nov. 24, 2010) (holding, in the context of a Title III wiretap, that "[t]o have misled knowingly or recklessly, the [G]overnment must have done more than make an intentional decision not to include the information").

### C.    Presumption of Validity

"Wiretap orders are presumed valid." United States v. Zapata, 164 F.3d 620 (2d Cir. 1998) (summary order); Salas, 2008 WL 4840872, at *3. A reviewing court should "grant considerable deference to the district court's decision whether to allow a wiretap, ensuring only that 'the facts set forth in the application were minimally adequate to support the determination that was made.'" Concepcion, 579 F.3d at 217 (quoting United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997)); United States v. Fleishman, No. 11 Cr. 32 (JSR), 2011 WL 4000987, at *2 (S.D.N.Y. Aug. 31, 2011); cf. United States v. Tortorello, 480 F.2d 764, 783 (2d Cir. 1973) ("A judge presumably will scrutinize any application and will scrupulously impose the restrictions required by statute.").

## II.      NO **FRANKS** HEARING IS WARRANTED

Defendants argue that the Government both failed to establish necessity under Title III and misled Judge Hochberg and Judge Chesler in its wiretap applications.[3]  Although Defendants pursue these arguments in tandem, for the reasons stated below the Court will address the latter argument first.[4]

### A.      The First Affirmation Did Not Include False Or Misleading Statements Or Omissions

Defendants argue that the Government misled Judge Hochberg by misrepresenting in the First Affirmation that the narcotics and stock fraud investigations were related.  Defendants argue that the Government's definition of the "Target Offenses" and "Target Subjects," and the description of the investigations to date in the First Affirmation, improperly conflated the narcotics and stock fraud schemes and misled the issuing court into believing that the Target of the wiretaps at issue was involved in the narcotics trafficking activities.  (Def. Mem. at 12–14.)[5]

This argument is without merit.  The First Affirmation specifically delineates the facts relevant to each scheme and describes the two together in general terms when applicable to both investigations.  The First Affirmation specifically states that the Target's phone (Target Phone 2) is believed to be used for the stock fraud scheme, not the narcotics trafficking.  (March 23, 2010 Affir. ¶¶ 8, 15.)  The First Affirmation also states that only "certain of the TARGET SUBJECTS" were believed to be involved in the stock fraud scheme.  (Id. ¶ 16.)  Furthermore, in a section

---

[3]  Defendants do not challenge Judge Hochberg and Judge Chesler's determinations of probable cause.

[4]  Mr. Levy joins in all of Mrs. Levy's arguments and states that the only distinction between their respective positions is that Mrs. Levy was recorded during the first and second periods of interception, while Mr. Levy was recorded during the second and third periods of interception.  (See Def. David Levy's Mem. of Law (Oct. 18, 2012), at 1–2.)  Mr. Levy argues this distinction carries no legal significance because the pertinent arguments for suppression turn on the initial application.  (Id.)

[5]  Defendants' argument that wiretaps are not appropriate for stock and wire fraud investigations is baseless.  (March 23, 2010 Affir. ¶ 2)  See United States v. Gupta, No. 11 Cr. 907 (JSR), 2012 WL 1066817, at *1 (S.D.N.Y. Mar. 27, 2012); Rajaratnam, 2010 WL 4867402, at *6.

entitled "C. Wire Fraud Involving a Pump and Dump Scheme at the Port," the First Affirmation identifies the Target in the context of the stock fraud scheme.  (Id. ¶¶ 40–44.)  By way of contrast, the Target is not mentioned in the factual portion of the First Affirmation detailing the investigation of narcotics trafficking.  In addition, in summarizing the activities of the Target's phone, which was previously identified as being used in the pump and dump scheme (id. ¶¶ 45–49), the Government described the Target's communications with others relating to the instant and prior stock fraud schemes (id. ¶¶ 57–60).  Again, there is no indication that the Target's phone was used in any of the narcotics trafficking activities otherwise described in the First Affirmation.

Perhaps most importantly, in the section of the First Affirmation stating the necessity of the wiretap on the Target's phone, the specific facts relating to the stock fraud scheme are distinguished from the concurrent narcotics trafficking investigation.  For the investigative techniques that the Government represented would not be likely to succeed, the Government explained why in the context of the stock fraud investigation.  (See, e.g., id. ¶¶ 65, 67, 70, 76, 77, 82.)  While the discussion in the First Affirmation of the use of search warrants and arrests and cooperation does not specifically distinguish between the two investigations, the information provided in these paragraphs permissibly applies to both investigations.  See United States v. Kazarian, No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *11 (S.D.N.Y. May 18, 2012) ("[T]he fact that the Government has repeatedly made the same or similar statements as to why alternative investigative means are not practical does not mean that those reasons are invalid."); Rajaratnam, 2010 WL 4867402, at *26 ("Where boilerplate accurately depicts the facts on the ground, Title III requirements are satisfied.").  These statements cannot have misled a District Court undertaking a "practical and commonsense" review into thinking the narcotics and stock fraud investigations were one and the same.  See Concepcion, 579 F.3d at 218.  The Court similarly rejects Defendants'

argument that Paragraph (a) of Judge Hochberg's March 2010 Orders, which state her finding of probable cause that the Target Subjects were involved in the Target Offenses, are evidence of having been misled.  Such a hypertechnical reading in this context is unnecessary.  Cf. Rivera, 928 F.2d at 602 ("[T]he courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." (quotations omitted)).

In short, the statements of the First Affirmation and its organization, along with its detailed recitation of those facts relating to the narcotics trafficking and other facts relating to the pump and dump scheme, its identification of the personnel involved in the narcotics trafficking and the pump and dump scheme, and the specification of Target Phones 1 and 3 as part of the narcotics investigation and Target Phone 2 as part of the stock fraud investigation, command but one common sense conclusion—the First Affirmation did not deceive or mislead Judge Hochberg into authorizing a wiretap for the pump and dump scheme because it was somehow connected with narcotics trafficking.  Defendants have failed to make a substantial preliminary showing that the First Affirmation contained false or misleading statements or omissions.

### B.   The Second Affirmation Did Not Include False Or Misleading Statements Or Omissions

Defendants likewise argue that the Second Affirmation misled Judge Hochberg into believing the stock fraud and narcotics trafficking investigations were related.  (Def. Mem. at 21–22.)  This argument is similarly without merit.  The Second Affirmation specifically identifies the Target (and his phone) as involved in the stock fraud scheme and not the narcotics trafficking.  (Apr. 26, 2010 Affir. ¶ 16.)  In summarizing the information learned from the previously approved wiretaps, the Second Affirmation specifically identifies the Target's phone only in the stock fraud scheme after discussing the use of the other previously wiretapped phones in the narcotics trafficking scheme.  (Id. ¶¶ 35–41.)  The Second Affirmation also specifically

states why other techniques would not reasonably appear to be successful in the stock fraud investigation, separately from the narcotics trafficking investigation.  (Id. ¶¶ 50, 53, 59, 60.)

Defendants argue the Second Affirmation did not account for information learned during the first period of interception, thus misleading the issuing court about the necessity for the extension of the wiretap.  (Def. Mem. at 22–28.)  Defendants claim that the Government's assertions that, for example, the Target would not be open to working with people he did not know (precluding use of confidential witnesses or informants) is undercut by recorded conversations the Target had with a co-conspirator about approaching companies to "go public," and that the Government's assertions that the Target would not share information about his scheme with others is undercut by recorded conversations with other Port employees about stocks the Target was trading in, the identities and locations of other participants, and the Target's trading strategy.  (Id. at 22–25.)

These attempts to vitiate the Government's assertions of necessity are unpersuasive, primarily for the factual reasons the Government provides.  (Resp. at 26–30, ECF No. 206.)  The information the Government learned from the first wiretap on the Target's phone confirmed the Government's prior assertions that the stock fraud scheme was ongoing and how it was unfolding, and the Second Affirmation permissibly restated the reasons the Government provided for why more traditional investigative techniques would not reasonably appear likely to succeed.  See United States v. Terry, 702 F.2d 299, 310 (2d Cir. 1983) (holding that where "the factual justification for the [wiretap] order had not changed at the time when an extension was sought, it was unnecessary to vary the specific facts . . . in the renewal application"), cert. denied 461 U.S. 931; see also Kazarian, 2012 WL 1810214, at *11; Rajaratnam, 2010 WL 4867402, at

*26.  The Government need not "include in [its] affidavit every piece of information gathered in the course of an investigation."  <u>Awadallah</u>, 349 F.3d at 67–68 (quotations omitted).

In sum, Defendants have not made a substantial preliminary showing that the Affirmations contained false or misleading misstatements or omissions, thus no <u>Franks</u> hearing is warranted.  <u>See</u> <u>Falso</u>, 544 F.3d at 126; <u>Zagari</u>, 111 F.3d at 322; <u>Rodriguez-Perez</u>, 2012 WL 3578721, at *7.[6]

## III.   THE WIRETAP APPLICATIONS SATISFIED TITLE III

### A.   The First Application Established Necessity

Defendants argue that the first wiretap application failed to establish necessity because the stock fraud investigation had "just begun" and failed to explain why other investigative techniques had been tried and failed or reasonably appeared to be unlikely to succeed if tried or were too dangerous.  <u>See</u> 18 U.S.C. § 2518(1)(c).  (Def. Mem. 16–21.)  This argument fails both because the Government provided sufficient reasons for not pursuing other investigative avenues and because the Government is not required under the law to exhaust any other investigative procedures before a wiretap may be authorized.  Defendants have not made a sufficient showing to override the deference the Court must grant to Judge Hochberg's finding of necessity.

As an initial matter, Defendants' argument that the first wiretap was the "initial step in [the Government's] criminal investigation" is quite wrong.  (Def. Mem. at 16 (quoting <u>United States v. Giordano</u>, 416 U.S. 505, 515 (1974).)  At the time it sought the first wiretap, the Government had discovered the past and present stock fraud schemes through conversations with CW-3, through CW-3 had consensually recorded the Target's conversations regarding both the

---

[6]  Mr. Levy argues that "the subsequent Applications and Affirmations suffer from the same problems as those initially submitted."  (Def. David Levy's Mem. of Law (Oct. 18, 2012), at 2.)  For the reasons stated above, the Court finds that the Third Affirmation did not contain any false or misleading statements or omissions.

Target's past and future stock purchasing activities, and had sought documents from and conferred with TD Ameritrade regarding the Target's prior activities.

Defendants further argue that the Government's stated reasons for not pursuing other investigative techniques were deficient because the reasons the Government provided were generalities either not specifically rooted in occurrences, or actually contradicted by the successful use of such techniques, in the stock fraud investigation. Yet the Government did provide specific reasons in the First Affirmation why consensual interception of CW-3's phone had progressed as far as it could (¶ 67), why physical surveillance was unhelpful in a scheme primarily taking place online and over the phone (¶ 70), why undercover officers would likely be unhelpful in an environment and scheme where the participants were highly familiar with each other (¶ 76), why the use of confidential witnesses beyond CW-3 would not progress the stock fraud investigation beyond the initial investor level (¶ 80), and why the use of grand jury subpoenas would be limited to historical information that would not reveal ongoing fraudulent activities (¶ 82).  In addition, the Government provided information that the Target was communicating via phone with other unidentified participants in the scheme (¶ 49) and using cash to perpetuate the scheme (¶ 48), making it harder to follow using traditional techniques.

Defendants' suggestions for how the Government should have further utilized other investigative techniques before resorting to seeking a wiretap are wide of the mark.  Defendants are not entitled to second-guess the Government's investigation.  The Second Circuit has repeatedly held that no "particular investigative procedures [must] be exhausted before a wiretap may be authorized."  Young, 822 F.2d at 1237 (quotations omitted); see Miller, 116 F.3d at 663. Furthermore, Defendants have provided no justification for why their proposed alternative techniques would be likely to succeed and not just be "theoretically possible."  Concepcion, 579

F.3d at 218; Rajaratnam, 2010 WL 4867402, at *22; cf. United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975) ("[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.").

Defendants assert that Judge Hochberg was misled by the Government that the narcotics trafficking and stock fraud investigations were related, and thus Judge Hochberg's determinations of necessity are not due the "considerable deference" that reviewing courts owe to the court that issued the wiretap.  See Concepcion, 579 F.3d at 217; United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000) (holding that "the affidavit . . . contained inaccuracies" and thus "the issuing judge's probable cause determination is not due any deference because he did not have an opportunity to assess the affidavit without the inaccuracies").  As indicated supra, given the statements of the First Affirmation, its organization, its recitations of facts related to the narcotics trafficking and stock fraud scheme and specification of the individuals involved in each, and its detailed reasons why alternative investigative techniques were not likely to work, Judge Hochberg was not misled. Her determinations and authorization of the wiretap on the Target's phone are due full deference. Accordingly, the Court declines to disagree with Judge Hochberg's finding of necessity.

At least two courts in this Circuit have held that "the Franks analysis is the appropriate framework through which to evaluate an attack on the truthfulness of a wiretap affidavit with respect to necessity."  United States v. Gupta, No. 11 Cr. 907 (JSR), 2012 WL 1066817, at *2 (S.D.N.Y. Mar. 27, 2012) (rejecting argument that "once [a court] conclude[s] that the Government did not provide a 'full and complete' statement in the affidavit with respect to necessity, [it] should . . . suppress[] the wiretap evidence, regardless of the omission's materiality"); see Rajaratnam, 2010 WL 4867402, at *18; Rajaratnam, 2010 WL 3219333, at *1.

Assuming *arguendo* that this is correct, the Court finds, for the reasons stated above, that

Defendants have not made the "substantial preliminary showing [of] a false statement" or

omission required under Franks because the Government did provide a full and complete

statement of necessity—which was not misleading.  See Franks, 438 U.S. at 155–56.  The Court

thus denies the Defendants' motion for a Franks hearing on the issue of necessity.[7]

## B.     The Second and Third Applications Established Necessity

Defendants argue that the subsequent wiretap applications failed to establish necessity

because the Second and Third Affirmations asserted the same "boilerplate" reasons as the First.

(Def. Mem. at 29; Def. David Levy's Mem. of Law (Oct. 18, 2012), at 2.)  For the reasons stated

above, the Court declines to disagree with Judge Hochberg and Judge Chesler's determinations

that the second and third applications satisfied Title III's necessity requirement, respectively.

## CONCLUSION

For the foregoing reasons, Defendants' motion to suppress and for a Franks hearing are

DENIED.  The Clerk of the Court is directed to close this motion.

Dated: New York, New York
       November 16, 2012

                                   SO ORDERED

                                   PAUL A. CROTTY
                                   United States District Judge

---

[7] Even if Defendants had made a substantial preliminary showing, not only that a false statement or omission of material information was included in the First Affirmation, but that this was done knowingly and intentionally, or with reckless disregard for the truth (which they have not), their relief would be for the Court to consider the application without the information relating to the narcotics trafficking to determine whether the allegations regarding the pump and dump scheme demonstrate necessity for the wiretap on the Target's phone.  See United States v. Coreas, 419 F.3d 151, 155 (2d Cir. 2005); United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000); see also United States v. Bianco, 998 F.2d 1112, 1125–26 (2d Cir. 1993) (applying in Title III context).  Even under this standard, the Court finds the first application satisfied Title III's necessity requirement for the reasons stated *supra*.  See Gupta, 2012 WL 1066817, at \*3; Rajaratnam, 2010 WL 4867402, at \*\*19–24.

17