UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| DONNA LEVY and DAVID LEVY, | |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 25, 2013

S5 11 Cr. 62 (PAC)

**OPINION AND ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Donna Levy ("Mrs. Levy") and David Levy ("Mr. Levy," collectively the "Levys" or "Defendants") move to suppress evidence seized during an October 5, 2010 search of their residence pursuant to a warrant that Defendants contend was unconstitutionally overbroad and did not satisfy the Fourth Amendment's particularity requirement. Mr. Levy also moves to suppress documents taken from him and photocopied by United States Customs agents during a December 17, 2011 search of Mr. Levy upon his return to the United States from Panama. In addition, Mr. and Mrs. Levy each move for a bill of particulars relating to certain of the allegations and charges against them, respectively, contained in the most recent Superseding Indictment.[1]

For the following reasons, Defendants' motions are DENIED.[2]

---

[1] Defendants also moved to suppress any evidence obtained from a wiretap authorized by the United States District Court for the Northern District of Georgia and to strike from the most recent Superseding Indictment allegations that they failed to disclose a previous civil judgment the Federal Trade Commission obtained against them; the Government consented to these motions, but has indicated it may seek to introduce evidence derived from the wiretap should Mr. Levy testify. The Court does not address these issues in this Order.

[2] After receiving the parties' briefs on these issues, the Court held oral argument on Defendants' motions on February 21, 2013. There are sufficient uncontested material facts for the Court to decide the motions herein without a separate evidentiary hearing. United States v. Hernandez, No. 09 Cr. 625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010); see United States v. Dupree, 781 F. Supp. 2d 115, 147 (E.D.N.Y. 2011).

## BACKGROUND

**A.      Procedural History**

Under the multiple-count Superseding Indictment dated June 28, 2012 (the "Indictment," ECF No. 188), Defendants are charged with securities fraud, wire fraud, conspiracy to commit securities and wire fraud, and money laundering.  On November 16, 2012, this Court denied Defendants' motion to suppress evidence of intercepted communications (and any evidence derived therefrom) from three wiretaps authorized by the United States District Court for the District of New Jersey, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22 ("Title III"), and for a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).  <u>See</u> <u>United States v. Levy</u>, No. S5 11 Cr. 62, 2012 WL 5830631.  (ECF No. 217.)

**B.      The October 4, 2010 Warrant Application and Search Warrant and
the October 5, 2010 Search of the Levys' Residence**

On October 4, 2010, at 5:48 p.m., United States Magistrate Judge Robin S. Rosenbaum of the United States District Court for the Southern District of Florida approved a search and seizure warrant (the "Search Warrant") for the Levys' residence, based on an application and affidavit of the same date of Special Agent Joseph Cerar of Immigration and Customs Enforcement (the "Cerar Aff.," Kramer Affir. Ex. A).  The Search Warrant was executed at 6:00 a.m. the following morning.

1.      The Warrant Application and Cerar Affidavit

Special Agent Cerar began his affidavit by detailing his training and law enforcement experience.  (Cerar Aff. ¶ 1.)  Special Agent Cerar stated that there was probable cause that evidence of violations of 18 U.S.C. § 1343 (wire fraud) and § 1349 (conspiracy to commit wire fraud) would be found at the Levys' residence, and that there was probable cause to believe that

Mrs. Levy[3] and other individuals and entities "are involved in an extensive 'pump and dump' fraud scheme . . . [that] has involved dozens of targeted stocks over at least a five-year period." (Id. ¶¶ 2–3.)  The bases of this determination came from Special Agent Cerar's training and experience, and his participation in the investigation, which included Title III wiretaps, financial and trading records, materials posted on various blogs, websites, and the social media networks Twitter and Facebook, and interviews of a confidential source.  (Id. ¶ 4.)

Special Agent Cerar described a scheme whereby Mrs. Levy and other individuals would manipulate and artificially inflate the market value of certain stocks by, inter alia, coordinating the public dissemination of misleading information about the companies and the increased trading in the companies' stocks, then "dumping" their holdings after other investors were deceived into buying such stock at the manipulated valuations.  (Id. ¶¶ 5–6.)  Special Agent Cerar identified a website and related email list that Mrs. Levy allegedly ran, and which she used to perpetrate the pump and dump scheme.  (Id. ¶¶ 7–8.)  Special Agent Cerar recounted debriefing the confidential source who stated that he had been to the Levys' residence several times to discuss the pump and dump scheme with Mrs. Levy, and that he had seen Mrs. Levy in her residence handle documents and access electronic records related to the scheme.  (Id. ¶ 8.)

Special Agent Cerar asserted that information derived from the wiretaps also established probable cause to believe that Mrs. Levy used her residence to engage in discussions about, and to execute, the pump and dump scheme with regards to the stock of one company, identified as "Stock 3."  (Id. ¶¶ 10–14.)  Special Agent Cerar stated that the information obtained from the wiretap regarding the manipulation of Stock 3 by Mrs. Levy and others coincided with sharply increased trading in Stock 3 consistent with a pump and dump scheme, and with information

---

[3]  The references to "LEVY" in the Cerar Affidavit are to Mrs. Levy.  (Id. at ¶ 2.)

about Stock 3 being disseminated by a Twitter account and an email account associated with the co-conspirators and Mrs. Levy.  (Id. ¶¶ 15–16.)

Special Agent Cerar also set forth the types of materials that he believed persons engaged in the pump and dump activities Mrs. Levy was accused of participating in would have at their homes, and stated that he believed such materials would be found in the Levys' residence and requested permission to seize these items.  (Id. ¶¶ 19–25.)  Special Agent Cerar specifically described the probable cause for the search and seizure of computers and other electronic devices used in the pump and dump scheme.  (Id. ¶¶ 20, 22–24.)

2.    The Search Warrant

The Search Warrant identified the Levys' residence as the property to be searched, and stated that it was believed to conceal "[e]vidence, [f]ruits, and [i]nstrumentalities of criminal violations of Title 18, United States Code, Sections 1343 and 1349, as further described in 'Attachment B.'"  Attachment B substantially mirrored Paragraph 19 of the Cerar Affidavit and described the property to be seized as:

> Evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1349 (Conspiracy to Commit Wire Fraud), and 1956 and 1957 (Money Laundering), including the following:
>
> a.    Financial statements, trade confirmations and bank records concerning trades of stocks and other financial instruments;
>
> b.    Company descriptions, reports, prospectuses, SEC or other regulatory filings, correspondence, stock certificates, and other records and documentation concerning stocks and other financial instruments;
>
> c.    Books, records, receipts, notes, ledgers, and other documents reflecting financial transactions, analyses and/or movement of funds;
>
> d.    Telecommunication access devices such as pre-paid calling cards, cell phones, and fax machines;

     e.     Address books, Rolodexes, diaries, spreadsheets, calendars, identification documents, photographs, video, and audio recordings, and other documents reflecting information concerning the identities of potential co-conspirators and any potential victims of these offenses;

     f.     Records concerning ownership and use of telephones, email accounts, websites, accounts on and lists of subscribers to social media sites such as Twitter, telephone message pads, correspondence, notes, memoranda, air bills and shipping records, and photographs, audio and video recordings of potential co-conspirators and any potential victims of these offenses;

     g.     Information, including titles, incorporation documents, receipts, correspondence, photographs and other records concerning ownership of the PREMISES, of other funds and financial accounts, of assets, and of assets such as bank and trading accounts or stocks that may be or have been used to facilitate the above offenses;

     h.     Cash, stock certificates, jewelry, and similar assets representing potential proceeds of the schemes;

     i.     Computers and computer equipment, including desktop and laptop computers, mobile computing devices such as smartphones and iPhones, disks and disk drives, peripheral devices capable of storing information such as printers, scanners, etc., and electronic data storage devices such as hard drives, CD-ROMs, thumb drives, flash media, and other similar devices, including all passwords, software, equipment and related manuals used to encrypt data stored on these devices, and any and all charging equipment or software, plus the manuals or instructions relating to such software as is used by the electronic devices or media previously specified in this attachment.

The Search Warrant did not include a date range limitation for the materials to be seized, nor did it limit the scope of the seizure to materials related to "Stock 3" (or reference or identify Stock 3). The Search Warrant also did not attach or incorporate the Cerar Affidavit or describe the underlying conduct as constituting a pump and dump scheme.

Law enforcement officers executed the Search Warrant on October 5, 2010 and seized two hand guns, two computers, two cellphones, and assorted documents.

### C.    The December 17, 2011 Border Search of Mr. Levy

On the evening of December 17, 2011, upon his arrival at Miami International Airport on a flight from Panama, Mr. Levy was detained by U.S. Customs agents.  (Aff. of David Levy ¶ 3, Kramer Affir. Ex. B ("David Levy Aff.").)  Mr. Levy asserts that the agents did not question him or inform him why he was being detained, but removed him to a holding area in the airport while they took and searched his possessions, including a notebook of his, which the agents viewed and photocopied.  (Id. ¶¶ 3–4.)  Mr. Levy states that he was held for approximately two hours, that he was not asked any questions, and that "[e]ventually they gave me back my belongings and told me I could leave."  (Id. ¶ 3.)

On December 20, 2011, less than three days after the border search, Mr. Levy was charged under Indictment S3 11 Cr. 62 (PAC) (ECF No. 134) for, inter alia, engaging in a multi-year pump and dump stock fraud conspiracy with Mrs. Levy in start-up companies, and a warrant was issued for his arrest.

### D.    The Indictment and Discovery

The 34-page June 28, 2012 Indictment alleges and charges a conspiracy involving Mr. and Mrs. Levy and others from 2007 through 2010 to defraud founders and executives of, and investors in, several start-up companies through which Mr. Levy would obtain shares in said companies, the Levys would coordinate the dissemination of misleading information about the companies in order to manipulate the price of the companies' stock, and would then sell the shares they owned at manipulated valuations (i.e., the "pump and dump" scheme) (Indictment ¶¶ 1–7); charges Defendants with securities fraud offenses relating to two start-up companies in connection with the alleged pump and dump conspiracy (id. ¶¶ 8–9); alleges and charges another stock fraud scheme by Mr. Levy through which he manipulated the stock of a third company (id.

¶¶ 10–13); alleges and charges Mr. Levy with a scheme to launder millions of dollars in proceeds from his stock fraud schemes through a Panamanian bank account and entities (id. ¶¶ 14–19); and alleges and charges Mrs. Levy with another conspiracy in which she sought to manipulate the stocks of several publicly-traded companies with low share prices, or "penny stock" companies (id. ¶¶ 20–26), and with securities fraud for the manipulation of one such company (id. ¶¶ 27–28).

In addition to the Indictment, the Government has filed a 32-page complaint (ECF No. 1) and three preceding indictments in this case (ECF Nos. 86, 88, 134).  The Government has also represented that it has provided Defendants with discovery, pursuant to Federal Rule of Criminal Procedure 16, as well as additional materials not otherwise required under Rule 16, including investigative reports prepared by the Financial Industry Regulatory Authority regarding pump and dump stock fraud activity involving at least four of the stocks referenced in the Indictment, reports identifying Mrs. Levy as a for-hire promoter of stocks subject to an alleged pump and dump scheme in 2006 and 2007, cooperating witness notes, the identities of alleged co-conspirators, and other information conveyed in telephone calls and in-person meetings with Defendants' counsel.  Defendants do not dispute these representations.

## DISCUSSION

## I.     GOVERNING STANDARDS

### A.     Constitutional Requirements for Search and Seizure Warrants

#### 1.     Probable Cause and Deference to the Issuing Court

The Warrants Clause of the Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Probable cause

is generally understood to be demonstrated "where the totality of the circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Clark, 638 F.3d 89, 94 (2d Cir. 2011) (quoting Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007)).

In considering a challenge to a warrant, a reviewing court should uphold "an issuing magistrate's probable cause determination . . . so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing."  Illinois v. Gates, 462 U.S. 213, 236 (1983) (quotations and alterations omitted); see Clark, 638 F.3d at 93 ("[T]he task of a reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate a substantial basis for making the requisite probable cause determination." (quotations omitted)).

### 2.      Overbreadth and Particularity

"To achieve its goal, the Warrants Clause requires particularity and forbids overbreadth." United States v. Cioffi, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009).  "Although somewhat similar in focus, these are two distinct legal issues: (1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers."  United States v. Hernandez, No. 09 Cr. 625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (citations omitted).

Of these two standards, "[b]readth deals with the requirement that the scope of the warrant be limited to the probable cause on which the warrant is based."  Cioffi, 668 F. Supp. 2d at 390 (quotations omitted).  Thus, "the issue is whether there exists probable cause to support the breadth of the search that was authorized."  United States v. Dinero Express, Inc., No. 99 Cr.

975 (SWK), 2000 WL 254012, at *9 (S.D.N.Y. Mar. 6, 2000) (quotations omitted); see United States v. Dupree, 781 F. Supp. 2d 115, 154 (E.D.N.Y. 2011).

"Particularity is the requirement that the warrant must clearly state what is sought." Cioffi, 668 F. Supp. 2d at 390 (quotations omitted). Particularity concerns arise when a warrant's description of the place to be searched or the items to be seized "is so vague that is fails reasonably to alert executing officers to the limits" of their search and seizure authority. Clark, 638 F.3d at 94. To satisfy the particularity requirement, "[a] warrant must be sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." United States v. Liu, 239 F.3d 138, 140 (2d Cir. 2000) (quotations and alterations omitted).

The Fourth Amendment does not require that every item or document to be seized be specifically identified in the warrant; generic terms may be used to describe the materials to be seized. United States v. D'Amico, 734 F. Supp. 2d 321, 361 (S.D.N.Y. 2010). "The level of specificity required by the Fourth Amendment depends on many factors," including the nature of the crime, and "[w]here . . . complex financial crimes are alleged, a warrant properly provides more flexibility to the searching agents." Dupree, 781 F. Supp. 2d at 149 (E.D.N.Y. 2011) (citations omitted); see United States v. Cohan, 628 F. Supp. 2d 355, 362 (E.D.N.Y. 2009) ("'[T]he degree to which a warrant must state its terms with particularity varies inversely with the complexity of the criminal activity investigated.'" (quotations omitted)).

### 3.   The "Good-Faith" Exception to the Exclusionary Rule

While a warrant that fails to satisfy the overbreadth and particularity requirements of the Warrants Clause may violate the Fourth Amendment, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." Herring v.

United States, 555 U.S. 135, 140 (2009)).  Where the officers executing a warrant conducted a search "in good faith and in objectively reasonable reliance on the warrant," the evidence obtained in that search will not be suppressed.  United States v. Buck, 813 F.2d 588, 592 (2d Cir. 1987).  In determining whether this "good-faith" exception to the exclusionary rule applies, a court must ask "the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."  United States v. Leon, 468 U.S. 897, 922 n.23 (1985).  This evaluation is made in light of "all of the circumstances."  Herring, 555 U.S. at 145 (quoting Leon, 468 U.S. at 922 n.23)).

Under the Supreme Court's decision in Leon, the good-faith exception will not apply in four situations, only one of which is relevant here: where the warrant was "so facially deficient— i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."  Leon, 468 U.S. at 923.

The burden is on the Government to demonstrate the objective reasonableness of the executing officers' good-faith reliance.  United States v. Voustianiouk, 685 F.3d 206, 215 (2d Cir. 2012).  A reviewing court must be "mindful that, in Leon, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection."  Clark, 638 F.3d at 100.

### B.      Border Searches and the Fourth Amendment

"It is well established that the government has broad powers to conduct searches at the border even where . . . there is no reasonable suspicion that the prospective entrant has committed a crime."  Tabbaa v. Chertoff, 509 F.3d 89, 97 (2d Cir. 2007) (collecting cases); see United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion,

probable cause, or warrant."). International airports are considered the functional equivalent of the border. Yuzary v. United States, No. 04 Civ. 2809 (RPP), 2005 WL 926909, at *6 (S.D.N.Y. Apr. 21, 2005) (citing Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973)).

Such suspicionless searches are permissible under the Fourth Amendment so long as they are considered "routine," but "[t]he precise line between what is routine and what is not routine . . . has not been clearly delineated." Tabbaa, 509 F.3d at 98. "Routine searches include those searches of outer clothing, luggage, a purse, wallet, pockets or shoes, which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." United States v. Irving, 452 F.3d 110, 123 (2d Cir. 2006); see Tabbaa, 509 F.3d at 98 ("The Supreme Court has stated that 'non-routine' searches include 'strip, body cavity, or involuntary x-ray searches.'" (quoting Montoya de Hernandez, 473 U.S. at 541 n.4)). Searches that are more invasive require reasonable suspicion. Irving, 452 F.3d at 123.

In evaluating whether a border search is routine, "[t]he determining factor is not how ordinary or commonplace a search is, but rather 'the level of intrusion into a person's privacy.'" Tabbaa, 509 F.3d at 98 (quoting Irving, 452 F.3d at 123).

### C.    Bills of Particulars under Federal Rule of Criminal Procedure 7(f)

Federal Rule of Criminal Procedure 7(f) authorizes the Court to "direct the government to file a bill of particulars" upon the defendants' motion "before or within 14 days after arraignment or at a later time if the court permits." "The standard for determining whether a bill of particulars is appropriate is based on necessity." United States v. Mandell, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) (quotations omitted).

"The purpose of a bill of particulars is to 'supplement the allegations in the indictment when necessary to (1) enable the defendant to prepare his defense, (2) avoid unfair surprise to the defendant at trial, and (3) preclude a second prosecution of the same offense.'"  Mandell, 710 F. Supp. 2d. at 384 (quoting United States v. Sturtz, 648 F. Supp. 817, 819–20 (S.D.N.Y. 1986)).  It "is not a discovery device and 'should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense.'"  Id. (quoting United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994)).

## II.     THE OCTOBER 4, 2010 WARRANT

### A.     Defendants' Overbreadth Challenge

Defendants argue first that Search Warrant was unconstitutionally overbroad. Defendants concede that, if Special Agent Cerar's statements are true, there was probable cause for a search and seizure, but only a limited one.  They assert that the Search Warrant improperly authorized the search and seizure of all documents and records in the Levys' home even though probable cause was limited to documents relating to the stock identified as "Stock 3" in the Cerar Affidavit.  In addition, Defendants argue that the Search Warrant improperly authorized the search and seizure of materials without date limitation even though probable cause was limited to documents relating to the Stock 3 scheme, which allegedly occurred during the time period of March 31, 2010 through May 7, 2010.

Defendants do not directly attack Magistrate Judge Rosenbaum's probable cause determinations, but conceptually their attack on the Search Warrant is that it authorized the search and seizure of materials beyond those for which probable cause was demonstrated in the Cerar Affidavit and warrant application.  This challenge to the determinations that probable cause existed for the seizure of all the materials listed in the Search Warrant must overcome the

Court's substantial deference to the issuing court's determinations. <u>See Dupree</u>, 781 F. Supp. 2d at 154; <u>Cohan</u>, 628 F. Supp. 2d at 363–64. Defendants have not done so. In light of the substantial deference the Court must give to the issuing magistrate, the Court finds that the Search Warrant was not unconstitutionally overbroad for authorizing the search and seizure of materials beyond those relating to the specific scheme to manipulate Stock 3 from March 31, 2010 through May 7, 2010. The Cerar Affidavit provided Magistrate Judge Rosenbaum a substantial basis to determine that the broader scope of the Search Warrant was appropriate and supported by probable cause. <u>Hernandez</u>, 2010 WL 26544, at *8.[4]

Initially, Special Agent Cerar described a complex financial fraud involving multiple actors including Mrs. Levy, the use of various methods and modes of communication in furtherance of the scheme, and lists the materials typically kept by individuals who participate in pump and dump schemes (which generally comprised the list of materials to be seized under the Search Warrant). Additionally, Special Agent Cerar provided a substantial basis from which Magistrate Judge Rosenbaum could conclude that there was probable cause to believe the fraud allegedly perpetrated with respect to Stock 3 had occurred with respect to other stocks. For example, Special Agent Cerar described information from the confidential source that Mrs. Levy had engaged in pump and dump schemes beyond the instant activities, which was corroborated by a conversation between Mrs. Levy and the confidential source regarding Stock 3 that was recorded over a Title III wiretap and which included references to previous similar activities. (<u>E.g.</u>, Cerar Aff. ¶ 14 ("'Copy mine, copy and paste like you always do.'" (quoting wiretap transcript).) The Government's review of Mrs. Levy's website and other conversations from the

---

[4] "[T]he affidavit must . . . be considered for purposes of an overbreadth (i.e., probable-cause) analysis because . . . the probable-cause analysis must be performed from the perspective of the magistrate who issued the warrant." <u>Cohan</u>, 628 F. Supp. 2d at 364 n.4 (citations omitted)).

Title III wiretap provided additional support for the conclusion that the alleged activities were ongoing and spanned a prolonged period of time.  (Id. ¶¶ 7, 8, 17.)

For similar reasons, in light of the substantial deference the Court must give to the magistrate judge's determinations of probable cause, the Court finds there was a substantial basis from which to conclude that there was probable cause of evidence beyond the time period in which Mrs. Levy and others allegedly manipulated Stock 3.  See Hernandez, 2010 WL 26544, at **8–9.[5]

Defendants rely heavily on Judge Karas' opinion in United States v. Vilar, No. S3 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007), but the overbreadth issues present there do not arise here.  In Vilar a company overseeing a vast amount of client money separate and apart from the accounts at issue in an investigation was faced with a warrant that authorized the seizure (without date restriction) of "*all* client files, *all* investment advisory agreements, and *all* documents concerning communications with . . . clients, regardless of whether those documents had any relation to the funds, accounts, and individuals addressed by the Warrant application."  Id. at *20.  Here, Special Agent Cerar identified specifically why each of the categories of materials sought were likely to be maintained in the Levys' residence and why there was probable cause to seize each category of materials as relating to the alleged pump and dump and money laundering schemes.  (See Cerar Aff. ¶¶ 19–24.)  Magistrate Judge Rosenbaum

---

[5]  The Court recognizes that the lack of any date range raises additional concerns here—where the Government had turned a co-conspirator and had access to Title III wiretaps and other evidence from which it could presumably have drawn rough information about the time period during which Mrs. Levy engaged in the alleged activities—compared to similar cases where the affidavit provided implied temporal limitations and more probable cause of the alleged conduct over an extended time period.  See Dupree, 781 F. Supp. at 155–56; Hernandez, 2010 WL 26544, at *9.  But even if the Court were to find that because "the warrant contained *no time frame at all* [and] thus, it allowed the seizure of records dating back arbitrarily far" in violation of the Fourth Amendment, Cohan, 628 F. Supp. 2d at 365, which it does not, as discussed below suppression would not be warranted in light of the good-faith exception to the exclusionary rule.

thus had a substantial basis to conclude that there was probable cause for each of the approved categories of materials, and for the reasons set forth above, the absence of a date limitation does not change this conclusion.

### B.    Defendants' Particularity Challenge

Defendants also argue that the Search Warrant lacks the requisite particularity due to its failure to specifically identify the targets of the search (i.e., the companies, individuals, websites, and Twitter accounts at issue), a time frame for the materials sought, or the conduct or alleged crime giving rise to the search, so that the executing officers had unbridled discretion to search and seize virtually all materials in the Levys' home.[6]

In his Vilar decision, Judge Karas noted that while "there is no fixed test for determining whether a warrant satisfies the particularity requirement," courts in the Second Circuit have generally focused on two factors that "tend to define a warrant's insufficient particularity." Vilar, 2007 WL 1075041, at *22.  First, Judge Karas stated that "warrants are generally found to be insufficiently particular where 'nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken.'"  Id. (quoting United States v. George, 975 F.2d 72, 76 (2d Cir. 1992)).  Second, courts find warrants lacking in particularity "where they include a general, catch-all paragraph or provision, often one authorizing the seizure of 'any or all records' of a particular type."  Id. (citing United States v. Bianco, 813 F.2d 1112, 1115 (2d Cir. 1993)).  A lack of particularity can be exacerbated "by the absence of any date restrictions on the items to be seized."  Id. at *23 (citations omitted).

---

[6] "[T]he affidavit may not be construed in conjunction with the warrant for purposes of a particularity analysis . . . because particularity deals with the extent to which the executing officer's discretion is cabined [and] the relevant perspective for that analysis is that of those at the scene of the search, who do not have meaningful access to the affidavit unless it is incorporated and attached," which it was not in this case.  Cohan, 628 F. Supp. 2d at 364 n.4 (citations omitted).

Defendants' argument that the Search Warrant's references to wire fraud, conspiracy to commit wire fraud, and money laundering are too broad and do not satisfy the particularity requirement is unconvincing in this case.  By specifically identifying the statutes and conduct that gave rise to the search and seizure, the Search Warrant sufficiently identified the suspected crimes for which there was probable cause, and which the materials to be seized evidenced.  See United States v. Russo, 483 F. Supp. 2d 301, 307–08 (S.D.N.Y. 2007).  Defendants' reliance on George, Cioffi, and Vilar, in which the warrants at issue contained no reference to the crimes being investigated, is thus unavailing.  See Dupree, 781 F. Supp. 2d at 150; Cioffi, 668 F. Supp. 2d at 396; Vilar, 2007 WL 1075041, at *22.

The Search Warrant is also sufficiently particularized in terms of the types of materials to be seized.  Hernandez, 2010 WL 26544, at *10.  The Search Warrant directed executing officers to particular types of financial documents and related materials (and electronic media where they may be stored), and excluded reference to personal documents unrelated to financial matters. "While some of the categories are somewhat vague, given the complexity of [the alleged] scheme and the numerous documents involved, the lists of items are described 'with as much particularity as circumstances reasonably allow[ed].'"  Id. (quoting George, 975 F.2d at 76)); see Dupree, 781 F. Supp. 2d at 149.  This is contrary to situations like Vilar, where the warrant "contained a general, catch-all provision" and stated that the authorized seizure was "not limited to" the types of materials otherwise specified in the warrant.  Vilar, 2007 WL 1075041, at *23.

Undoubtedly, it would have been preferable if the Government had included a more specific time frame in the Search Warrant.  However, "[t]he Second Circuit has not yet addressed the impact of the absence of a time frame to the particularity of a search warrant."  Hernandez, 2010 WL 26544, at *11.  The Court need not resolve whether the lack of a time limit renders the

Search Warrant unconstitutional because the continuing uncertainty in this Circuit regarding this issue triggers the good-faith exception to the exclusionary rule.  See id. at *12; Cohan, 628 F. Supp. 2d at 367.

### C.      The Officers' Good-Faith Reliance on the Search Warrant

Even if the Court were to find that the Search Warrant violated the Fourth Amendment, the evidence obtained via the execution of the Search Warrant would not be suppressed because of the good-faith exception to the exclusionary rule.  Defendants assert that, in light of their overbreadth and lack of particularity arguments, the Search Warrant was so facially deficient as to render reliance on it unreasonable.  "Not every facially deficient warrant, however, will be so defective that an officer will lack a reasonable basis for relying upon it."  United States v. Rosa, 626 F.3d 56, 66 (2d Cir. 2010).  A comparison of the Search Warrant to the cases Defendants rely on shows why the good faith exception should apply here.

Defendants rely in part on the Second Circuit's decision in George, which held that "[s]ince it was quite clear when this warrant was executed that 'limits' to a search consisting only of a broad criminal statute were invalid, a fortiori, a warrant not limited in scope to any crime at all is so unconstitutionally broad that no reasonably well-trained police officer could believe otherwise."  George, 975 F.2d at 77.  The Search Warrant here, however, cannot be said to be "so facially deficient" as to preclude reasonable reliance where it expressly provided that the officers were authorized to seize "[e]vidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1349 (Conspiracy to Commit Wire Fraud), and 1956 and 1957 (Money Laundering)."  See Dupree, 781 F. Supp. 2d at 149. Furthermore, the Search Warrant did not authorize the seizure merely of "any . . . evidence relating to the commission of a crime."  George, 975 F.2d at 74, 77.  Rather, the Search Warrant

was limited to specific categories of materials relating to alleged complex financial crimes perpetrated in part using computers and electronic media.  See Dupree, 781 F. Supp. 2d at 149–50 ("Accordingly, the warrant explicitly made clear to the executing officers that the offenses being investigated in this case are mail, wire, and bank fraud, and attempts and conspiracy to commit the same, pursuant to 18 U.S.C. §§ 1341, 1343, 1344 and 1349 and that the items to be searched and seized were evidence of those offenses.").  Given the nature of the complex financial crimes and conspiracy alleged, executing officers would reasonably expect to find fairly broad categories of financial documents to be seized.  Hernandez, 2010 WL 26544, at *12.

For overbreadth and particularity purposes, no controlling authority requires a specific time frame.  In these circumstances, it cannot be said that executing officers should have realized a lack of date limitation constituted a facial deficiency in the Search Warrant such that reliance on it would be unreasonable.  See Hernandez, 2010 WL 26544, at *12 (citing Cohan, 628 F. Supp. 2d at 365–66).[7]  As such, the executing officers were entitled to rely in good faith on the "objectively reasonable legal conclusions of [the] issuing judge."  Buck, 813 F.2d at 592–93.

Certainly, the Government must prove the reasonableness of reliance on a warrant, but as the Supreme Court recently stated, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or as we have sometimes put it, in 'objective good faith.'"  Messerschmidt v. Millender, 132 S.Ct 1235, 1245 (2012) (quoting Leon, 468 U.S. at 922–23).  While this does not end the inquiry into objective reasonableness, see id., after reviewing the Search Warrant in light of all the circumstances, the Court finds it not so facially deficient as to preclude good-faith reliance.

---

[7]  Several courts in this Circuit have recognized the constitutional questions that are raised by the lack of a specific date range in a warrant for documentary records and warned the Government to include one when possible.  See, e.g., Hernandez, 2010 WL 26544, at *11; Cohan, 628 F. Supp. at 365–67 & n.7.  The Court joins in this admonishment.

Accordingly, Defendants' motion to suppress the evidence seized pursuant to the Search Warrant is denied.

## III.   THE DECEMBER 17, 2011 BORDER SEARCH OF MR. LEVY

Mr. Levy argues that evidence derived from the notebook that Customs agents searched and photocopied during the December 17, 2011 border search at Miami International Airport should be suppressed because this search went beyond the type of "routine" searches that are permissible without any suspicion, and because Customs agents lacked reasonable suspicion that Mr. Levy was violating the crimes they are empowered to investigate.

In support of his argument that the photocopying of his notebook by customs agents went beyond the "routine" and thus necessitated a reasonable suspicion, Mr. Levy relies on United States v. Bin Laden, No. S7 98 Cr. 1023 (LBS), 2001 WL 30061 (S.D.N.Y. Jan. 2, 2001). Bin Laden rejected a defendant's argument that a border search was unconstitutional because the Government photocopied his personal papers, but observed that "the government's reading and photocopying of documents during a border search is appropriately subjected to a reasonable suspicion standard." Id. at *4 n.7. Similarly, the court in United States v. Soto-Teran, 44 F. Supp. 2d 185 (E.D.N.Y. 1996), held that the reasonable suspicion standard should apply to "the actions of border officials in closely reading and photocopying documents." Id. at 191. The Magistrate Judge in Soto-Teran stated that while

> a perusal of documents or letters to identify the nature of the documents and to verify that they contain no contraband or dutiable items would clearly fall within a routine border search since such an intrusion is minimal[, . . .] once a search of a sealed envelope or package reveals no contraband or dutiable items, a close reading of the contents of documents could intrude on a person's privacy since such documents could deal with very personal matters, such as a diary or desk calendar. Id.

The Government contends that the border search of Mr. Levy was routine and thus does not require reasonable suspicion,[8] and notes that the evidence in Bin Laden was not suppressed.

There is "a good deal of distance between strip and body cavity searches near one end of the spectrum," which require reasonable suspicion, "and a search of pockets or outer clothing near the other," which require no suspicion, "and the search[] at issue here fall[s] somewhere in the middle." Tabbaa, 509 F.3d at 98. Bin Laden stands for the proposition that photocopying an entrants personal papers does not, by itself, make a border search unconstitutional where the reasonable suspicion standard is satisfied.

The close reading and photocopying of an entrant's documents goes beyond the general searching one expects at a point of entry, and may intrude greatly on a person's privacy. See Soto-Teran, 44 F. Supp. 2d at 191; see also Irving, 452 F.3d at 123 ("[T]he level of intrusion into a person's privacy is what determines whether a border search is routine."). The Government's photocopying and potentially permanent retention of an entrant's personal papers for use in a future prosecution rises beyond the level of intrusiveness that the Second Circuit has recognized as "routine." Cf. Tabbaa, 509 F.3d at 99 (finding fingerprinting and photographing during border search routine where "the photographs and fingerprints were used solely to verify plaintiffs' identities and then were discarded from the government's databases").

The Government argues that if this was a non-routine border search, the search was proper because there was reasonable suspicion to believe Mr. Levy was committing stock fraud,

---

[8] The Government's argument that it does not matter that the border search was pretextual is itself of no moment. See Irving, 452 F.3d at 123 ("As pretext should not determine the validity of a border search, it also should not determine whether a border search is routine (meaning it does not require reasonable suspicion)."). Mr. Levy does not argue that the border search was unconstitutional because it was pretextual; he argues that it was unconstitutional because the level of intrusion into his privacy made the search more than routine and was without reasonable suspicion. See Muhammad v. Ahern, 350 F. App'x 529, 531 (2d Cir. 2009) (summary order) ("[T]he appropriate issue for a Fourth Amendment challenge to a border stop is not the motive behind the stop, but the intrusiveness of the search." (citing Irving, 452 F.3d at 123)).

for which he was indicted less than three days after the border search.  Mr. Levy contends that the Government must have reasonable suspicion of "relevant crimes" for the purposes of a border search, that is relating to customs duties or contraband.

The border search the Second Circuit approved in Irving was based on a reasonable suspicion that the defendant was in possession of child pornography, which is considered contraband.  See United States v. Williams, 553 U.S. 285, 297 (2008); Von Hofe v. United States, 492 F.3d 175, 184 (2d Cir. 2007).  But neither the Irving decision nor the Bin Laden ruling expressly limit the crimes for which customs agents may conduct non-routine searches if they have a reasonable suspicion.  See Irving, 452 F.3d at 124; Bin Laden, 2001 WL 30061, at *4.[9]  Nor does fact that Mr. Levy's notebook was returned to him after it was copied demonstrate that it was not properly subject to a non-routine search; the materials the Government searched and photocopied in Bin Laden were returned as well.  See Bin Laden, 2001 WL 30061, at *2.

The information the Government had obtained through its investigation, which culminated in Mr. Levy's indictment, supports a finding that the Government had reasonable suspicion to believe Mr. Levy was engaged in a stock fraud conspiracy, thus providing the basis for the non-routine border search to which he was subjected.  See id. at *4 & n.6.[10]  Accordingly, Mr. Levy's motion to suppress the evidence from the December 17, 2011 border search is denied.

---

[9]  That Customs agents are authorized by statute to perform searches for contraband or materials subject to duties does not mean that Customs agents are expressly limited to only searches for such items.  See United States v. Gurr, 471 F.3d 144, 148–49 (D.C. Cir. 2006).

[10]  Indeed, according to Mr. Levy, he returned to the United States upon learning that he was a target of the Government's investigation (which had previously led to the indictment of his wife), and did so specifically to face the charges that were soon to face him.

## IV.    THE MOTIONS FOR BILLS OF PARTICULARS

### A.    Mr. Levy's Motion

Mr. Levy seeks a bill of particulars to identify the untrue statements and omissions the Government alleges as part of the substantive securities fraud charges in the Indictment.  This Court has previously rejected similar requests by defendants seeking the specific content of misrepresentations made to investors.  See Mandell, 710 F. Supp. 2d at 384.  Here, the Indictment describes the types of material misrepresentations and omissions that Mr. Levy allegedly made regarding the purpose in providing funding to the target companies (including the intention to manipulate the stock of such companies) (Indictment ¶ 2(b)); the extent of Mr. Levy's financial commitment to the target companies (id. ¶ 2(c)); Defendants' participation in the manipulation of the target companies' stock (id. ¶ 2(d)); and the meaning of agreements he presented to the target companies (id. ¶ 2(e)).  (See id. ¶¶ 8, 10 (incorporating the allegations in Paragraph 2).)  Furthermore, the Indictment identifies the companies in which Defendants both allegedly engaged in a pump and dump scheme (id. ¶ 9), and a company in which Mr. Levy alone is charged with engaging in a pump and dump scheme (id. ¶ 11).  As in cases seeking the names of individual investors allegedly defrauded, Mr. Levy's request for a recounting of each specific misrepresentation and omission alleged "'is simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars.'"  Mandell, F. Supp. 2d at 385 (quoting Russo, 483 F. Supp. 2d at 311).

Mr. Levy's argument that a bill of particulars is necessary due to the amount of discovery produced by the Government is also unpersuasive.  The allegations of the Indictment are sufficiently specific to apprise Mr. Levy of the crimes with which he is charged, and thus "the amount of discovery is of little import."  Id.  While the Court may sympathize with counsel's

task of reviewing a large quantity of materials that continue to be produced by the Government, the applicable Indictment was filed almost eight months ago, and counsel has had the opportunity to review discovery materials as the Government has produced them.

As Mr. Levy has not made the required showing of necessity, the Court denies his motion for a bill of particulars.

### B.    Mrs. Levy's Motion

Mrs. Levy also moves for a bill of particulars with regard to the "manipulation for hire" scheme alleged in the Indictment and charged in Count Six.  Mrs. Levy seeks the identities of the companies whose stock she is accused of manipulating during the time period from 2007 to 2010.  The Indictment's identification of two companies as the subject of the manipulation for hire scheme and the otherwise detailed allegations concerning this scheme preclude a finding that the charges of the Indictment are so general that they do not advise Mrs. Levy of the specific acts of which she is accused. Mandell, 710 F. Supp. at 384 (citing United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)).  In addition, at oral argument the Government agreed to provide Mrs. Levy with the relevant information she seeks.  Accordingly, Mrs. Levy has not shown the necessity for a bill of particulars, and her motion is denied.

### CONCLUSION

For the foregoing reasons, Defendants' motions to suppress and for bills of particulars are DENIED.  The Clerk of the Court is directed to close this motion.

Dated: New York, New York
       February 25, 2013

SO ORDERED

PAUL A. CROTTY
United States District Judge